

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

OCT 2 3 2006

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

|  |  |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | |
| and | Case No. 02 C 3768 |
| CATHERINE COPELLO and ALLISON KENNEDY, | 03 C 2293 |
| Plaintiffs-Intervenors, | Hon. Harry D. Leinenweber |
| v. | |
| CUSTOM COMPANIES, INC., CUSTOM EXECUTIVE GROUP, INC. and CDN LOGISTICS, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

The Equal Employment Opportunity Commission (hereinafter, "EEOC") and Plaintiff-Interveners Catherine Copello and Allison Kennedy (hereinafter, "Interveners") (collectively, the "Plaintiffs") filed suit against Defendants Custom Companies Inc. (hereinafter, "Custom") and Custom Executive Group (hereinafter, "CEG") (collectively, the "Defendants") alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000 *et seq.* Together, the EEOC and the Interveners allege that Defendants subjected a class of women to a hostile environment of sexual harassment. The EEOC alleges that

Defendants retaliated against Kimberly Fritkin and Corinne Miller in violation of Title VII. Individuals Catherine Copello and Allison Kennedy also allege retaliation and sex discrimination. Defendants move for summary judgment on the class and individual claims. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I. BACKGROUND

The following facts represent a reading of the record that is favorable to Plaintiffs. Some of the factual matters that are in dispute have been noted. As Defendants have moved for summary judgment, all reasonable inferences must be resolved in favor of Plaintiffs. *Valance v. Wisel*, 110 F.3d 1269, 1276 (7th Cir. 1997).

Custom is located at 317 West Lake St. in Northlake, Illinois. Perry Mandera ("Mandera") is Custom's sole shareholder and officer. CEG employs some of Custom's management team. Custom is a full-service transportation company that brokers freight to various outside shippers. It does not actually move freight. Through its vendors, it offers local cartage, airfreight, truckload and less than truckload transportation services.

Custom's sales department sells its products and services to manufacturers and distributors. The number of people employed by the sales department is in dispute, ranging from 10 to 19. The representatives' responsibilities include attending weekly meetings, prospecting new business, maintaining current accounts,

and complying with company policies. In order to prospect new business and maintain current accounts, the representatives were expected to entertain customers. Such entertainment included meals, concerts, theaters, sporting events, and for some representatives, taking clients to a "gentleman's club" today known as VIP but formerly known as the Crazy Horse. Mandera owned the Crazy Horse and made it available to his sales representatives for client entertainment purposes.

Custom employs an individual to be responsible for human resources functions. From 1990 to 2000, Thomas Boyle ("Boyle") served as either Assistant Vice President or Vice President of Administration and had primary responsibility for human resources issues. In 1998, Terry Klonowski ("Klonowski") became Human Resources Manager and reported to Boyle until 2000 when he left his position. In late 2002, Klonowski was promoted to Vice President of Human Resources.

Custom distributes an Employee Handbook, which contained its anti-harassment and discrimination policies. The policies included: an explanation of prohibited conduct; assurance that employees who complained against discrimination would not be retaliated against; a complaint process including an investigation process; assurance regarding the confidentiality of complaints; and assurance that appropriate action would be taken when harassment

- 3 -

occurred.    Whether all employees received the handbook and the actual complaint process with Custom are in dispute.

## A. Catherine Copello

Copello was employed at Custom from October 10, 1994 until she was terminated on November 16, 1999.    She was given a copy of Custom's Employee Handbook and acknowledged on subsequent occasions that she received it.    Copello was hired to bring her experience and clients in the air freight business to Custom and to expand on those relationships by selling additional services.    Until 1996, Copello was not assigned a specific territory but was allowed to sell in different areas without restriction.    Copello's compensation consisted of a base salary, commission, and a car allowance.    In 1996, Copello was assigned the Elgin territory and allowed to continue to service her existing airfreight accounts.

Custom claims that Copello was consistently one of the lowest performing sales representatives.    In 1998, Copello met with John Murphy, the Vice President of Sales, to discuss possible changes to her compensation structure allegedly due to her performance.    She was told that she might be terminated.    As a result of the meeting, Copello's compensation was reduced by $5,000 and she was placed on a commission plan.    Whether this new arrangement was agreed to or voluntary is disputed.    Her revenue numbers are also in dispute because she alleges that accounts were either taken away from her or not properly credited to her.    Eventually, she was terminated.

- 4 -

The allegations of sexual harassment in Copello's Response to Defendants' Motion for Summary Judgment are detailed and extensive. The court will not list every allegation here and notes that Defendants' dispute almost every allegation. Copello alleges that she experienced constant harassment during her employment at Custom. Copello alleges that she experienced unwanted sexual touching by three different men at the offices of Custom or at a business related events. Assistant Sales Manager Rich Rohde ("Rohde") rubbed his hands up and down her back while telling her he loved her and discussing his penis size. Vice-President of Sales Mike Fleming ("Fleming") rubbed her thighs, arms and backs. A workplace contractor, Marcelino grabbed Copello and touched her numerous times. Copello was also subjected to unwelcome sexual propositions from her co-worker, George Wiszowaty ("Wiszowaty"). He told Copello he wanted her to "fuck him," "suck him" and that he was going to "fuck her brains out." Vice-President of Truckload Operations Tom Kolzow ("Kolzow") continually asked Copello if she had gotten "fucked" the night before and asked with whom she had had sex. Wiszowaty asked if she had "fucked" a guy she dated and in which sexual positions she had engaged.

In addition to the above, Copello was subjected to constant sexually explicit comments by several managers and co-workers including but not limited to, Tom Kolzow, George Wiszowaty, Chief Financial Officer John Oster ("Oster"), and Mike Fleming. The

comments including frequent use of the word "fuck" and often described graphic sexual episodes in which the men had engaged. Fleming and John Oster told Copello to have sex with customers because it was good for business. Fleming also told Copello how often he went home and "fucked [his] wife in the bathtub." Other sales representatives described their sexual episodes with their girlfriends, spouses, and co-workers. At sales meetings, Copello frequently heard obscene language used including: "dick," "dickhead," "cock," "pussy," "fuck," and "cunt." Wiszowaty also unzipped his pants and exposed himself at a bar after a Custom Event in front of Copello.

Copello also alleges that she was pressured to entertain at the Crazy Horse and had to listen to repeated conversations about other sales representatives' experiences at the strip club. In addition, strippers from the Crazy Horse were hired to work an annual Custom golf outing. During the golf outing, the strippers were dressed in short shorts and bikini tops and acted in a sexually suggestive manner with both Custom employees and customers.

Copello contends that, beginning in 1995, she continually complained to her Division Vice President John Murphy ("Murphy"). She complained to Murphy about Kolzow's conduct, the presence of the strippers at the golf outing, the comments made by Fleming, and pornographic materials left on her desk. She also complained to

Murphy about Wiszowaty's continual harassing behavior and Oster's sexually explicit comments. She complained to Mandera and Fleming in 1998 about Kolzow's and Wiszowaty's behavior. Finally, she complained to managers Janene Sudis and Cindy Alan about Tom Fink's inappropriate comments. Copello also complained to Human Resources Manager Terry Klonowski about Vice-President of Sales Mike Maher harassing Allison Kennedy in 1998.

On January 8, 1999, Copello complained orally to Human Resources Manager Terry Klonowski about inappropriate and sexual comments she had heard in the office and at company events. On January 14, 1999, Copello submitted a memorandum stating that she was the victim of 17 categories of misconduct. The misconduct included verbal comments of a sexual nature including being questioned about her own personal sexual experiences and being subjected to the discussion of others' sexual experiences, profanity, sexual and racist jokes, inappropriate sexual materials left on her desk at work, pressure to entertain at the Crazy Horse, the presence of Crazy Horse strippers at Custom sponsored events, and unwanted physical contact. She also alleged that she was excluded from company events on basis of her sex, received unequal pay, and other inferior perks.

Following her written complaint, Klonowski and Boyle conducted an investigation into Copello's allegations. The investigation included interviewing potential witnesses including Mandera. Most

of the witnesses denied her allegations. As a result of the investigation, written warnings were issued to several employees as the result of inappropriate language. A disciplinary warning was also issued to Wiszowaty for exposing himself at a bar.

In June 1999, Copello wrote a memorandum to Mandera regarding the upcoming Custom golf outing. She stated that the presence of Crazy Horse strippers at the outing created a sexually-hostile environment. On June 23, 1999, Mandera responded that attendance at the Event was not required and that no one at the Event would be unclothed. Also in June, Copello wrote to Mike Maher stating that she wanted a separate golf outing, the same terms and conditions regarding expense accounts and benefits that male representatives had, and she wanted him to accompany her on weekly sales calls. On October 14, 1999, Copello wrote to Klonowski stating that at a sales meeting, Mandera repeatedly yelled "fuck" and told her that "Fuck you, Catherine Copello, I don't give a fucking damn about your lawsuit. . . ." Boyle interviewed Copello regarding her recent complaint on October 25, 1999. He also interviewed each attendee of the sales meeting. Each individual stated that Mandera had used profanity, had apologized, but had not mentioned the lawsuit. Mandera admitted using profanity but denied making the comment regarding the lawsuit. Boyle met with Copello again in November to discuss her allegations relating to the golf outing.

Copello alleges that following her oral and written complaints, Mandera made several comments telling her that if she did not drop the EEOC lawsuit things were going to get ugly, lives would be ruined and that she would never be able to work in the trucking industry again.  In addition, Kolzow began to treat her differently, including not giving her clients sufficient attention and delaying giving her quotes.

## B. Allison Kennedy

Kennedy worked for Custom from August 17, 1998 until October 20, 1998.  She was hired for her expertise in air freight business.  Kennedy alleges that during her seven weeks at Custom she was subjected to unwanted touching and numerous inappropriate sexual comments.  She alleges that when she began the Vice President of Sales John Murphy refused to train her and told her it was because she was female.  She informed Mandera about Murphy's conduct and was told she would receive training without going through Murphy.

She also alleges that her supervisor, Mike Maher, who replaced Murphy as Vice-President of Sales, repeatedly questioned her about her sex life, suggested that she exchange sexual favors for business with potential customers,  frequently told her to let customers touch her in a sexual way to generate business, and constantly questioned her about her sexual experiences with her boyfriend.  While Kennedy was climbing the stairs, Maher put his hand under her skirt and grabbed her butt.  On a separate occasion,

he again grabbed her butt when she walked by him in the Custom hallway. Finally, when driving on a trip to a sales call, Maher grabbed her leg, motioned his hand on her breast and down to her inner leg. He repeatedly asked her if she engaged in oral sex and also asked her if "she took it in the butt."

Kennedy also alleges that George Wiszowaty made sexual comments at sales meetings including "slamming women in the butt," or grabbing their "boobs." At sales meetings, the representatives would discuss sleeping with strippers from the Crazy Horse and their activities at the strip club. Kennedy heard truckload employees refer to women as "bitches" and "cunts."

After refusing Maher's advances, on October 20, 1998, Custom fired Kennedy with the stated reason that she failed to generate revenue. Following her termination, Kennedy attempted to contact Mandera to discuss her situation with Maher and her termination. Mandera allegedly told her that Maher could run his department as he saw fit. Prior to her termination, Kennedy complained about Maher's actions to Copello and Mike Fisher, the Customer Service Manager. Copello contacted Klonowski and informed her of the harassment Kennedy was experiencing one day prior to Kennedy's termination.

## C. Kimberly Fritkin

Kimberly Fritkin was hired on October 12, 2000 as a sales representative and paid $1,000 weekly. The parties dispute whether

Fritkin was an employee or an independent contractor as well as whether the weekly $1,000 was a draw against commission or a salary. At the end of 2000, Fritkin was issued a Form 1099. During her time at Custom, Fritkin reported solely to Bob Heinz ("Heinz"), the Vice-President of Sales. She contacted him for leads and reported to him on her sales calls and any issues with clients. On a few occasions, she accompanied Heinz on lunches to entertain clients. She attended sales calls with Heinz approximately once a week.

Fritkin alleges that Heinz, her direct supervisor, constantly subjected to her to inappropriate behavior. Heinz would arrange to meet her to discuss business and then begin talking to her about beginning a personal relationship. When Fritkin called him to discuss business, he would change the subject to discuss his personal problems and how he wanted to sleep with her. He told her he missed her and was in love with her. He continually touched her, including grabbing her arm or hand, trying to kiss her, and touching her butt. Heinz also tried to put his foot up her skirt at a meeting with a client. Fritkin kicked his leg in response and later the client contacted her saying that "Bob was scum." He repeatedly told her he wanted to have sex with her. He also drove by her house on numerous occasions and called her throughout the day and night attempting to meet in order to have sex. He explicitly told her that he wanted to "fuck" her. After a sales

meeting, he attempted to pull her into a hotel. He invited her to the Crazy Horse and reprimanded her for failing to take clients there.

When Fritkin was in the Custom office building, Steve Laue ("Laue") put $100 on the table. Heinz told her the $100 was a bet on who could sleep with her first. Fritkin told Heinz to "fuck off." Heinz responded that "If you fuck with one person, you're just going to fuck yourself." He also told Fritkin that if she said anything about him, he would make her life a living hell. After that incident with Steve Laue, Fritkin's compensation was lowered from $1,000 a week to $750. Custom alleges that the decrease in salary was a result of Fritkin not generating sufficient revenue. When Heinz stopped making the comments, he ceased in helping Fritkin with her sales and said "why should I help you if you don't do anything for me?"

Fritkin never received a copy of Custom's Employee Handbook or a copy of its anti-harassment policy. She had no information concerning the complaint procedure. She asked Heinz on several occasions to stop the behavior and that told him that he was making her job impossible. Eventually, she asked to meet with Mandera without Heinz. She waited to meet with Mandera for an hour and half but he left his office informing her that he did not have time to meet. Following that incident, Fritkin resigned from Custom.

- 12 -

### D. Linda Dyson

Linda Dyson worked at Custom from February 1998 to April 1998 as a night biller, entering computer information related to truck transportation. She filled out the standard employee paperwork on her first day and met Boyle. Dyson did not receive an employee handbook.

Dyson claims that she heard inappropriate sexual and racist comments in the lunchroom. She also alleges that Marcelino repeatedly used profanity in front of her. In March, Marcelino began speaking directly with Dyson. He asked Dyson to "fuck" him. She told him no and that he had a filthy mouth. At one time, he also asked her to join him at the Crazy Horse. Dyson also heard Marcelino call women "bitches" and "cunts." When Marcelino walked by Dyson, he would get too close and rub against her.

Dyson told her supervisors that Marcelino was harassing her and that he had a filthy mouth sometime in March. They responded that Marcelino was Mandera's friend. Dyson quit Custom due to an altercation was another female employee.

### E. Janene Sudis

Sudis worked at Custom from 1995 to 2001, eventually becoming a manager. After attending a Custom event for managers at the United Center, Sudis joined coworkers, including Mandera, at the Crazy Horse. She alleges that she felt pressured to attend in order to be a team player. While at the Crazy Horse, strippers

came off the stage and performed lap dances on each of the four female employees that were present. A female stripper sat on Sudis' lap with her breasts in front of Sudis' face. After the lap dance, Sudis left in the first available car. Sudis also alleges she was exposed to sexually suggestive behavior because the Crazy Horse strippers selling tickets at the golf outing dressed and acted in a sexually provocative manner. A fellow employee also asked her whether she got the "fire hose" referring to sex with her husband who was a firefighter. Finally, Sudis heard an array of sexually explicit comments made by various Custom employees including Wiszowaty and Marcelino. She also alleges that she saw a co-worker fondle another co-worker's breasts.

Sudis complained to Klonowski, Steve Laue, and Mandera about a female co-worker's dress code but was informed the outfit was permitted by the code. Aside from complaining about a co-worker's dress, Sudis did not complain about the lap dance or the other inappropriate comments. Sudis attended a seminar on sexual harassment held within Custom and she also received an employment packet detailing Custom's policy on sexual harassment multiple times.

## II. **ANALYSIS**

### A. **Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. Catrett*, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the Court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir.2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989).

## B. Administrative Determination to Bring Case as a Class

Defendants argue that the EEOC's investigation was insufficient to support its complaint. Contrary to Defendants' assertions, there is no judicial review of the adequacy and scope of the EEOC's investigation. The Seventh Circuit recently ruled in

*EEOC v. Catepillar, Inc.*, 409 F.3d 831 (7th Cir. 2005) that the court had to accept the EEOC's administrative determination concerning alleged discrimination discovered during its investigation and could not itself review the scope of the investigation.

## C. Sexual Harassment

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Whittaker v. Northern Illinois University,* 424 F.3d 640, 645 (7th Cir.2005).

Defendants seek dismissal on the grounds that Plaintiffs failed to establish they were subject to a hostile working environment. To sustain a claim for hostile work environment, a plaintiff must establish that she was subject to harassment because of her sex, that the harassment was "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment. *E.E.O.C. v. Walsh Construction Co.,* No. 03 C 3601, 2006 WL 2524140, at *3 (N.D. Ill. Aug. 30, 2006, citing *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 462 (7th Cir. 2002). "Whether the harassment rises to this level turns on a constellation of factors that include 'the frequency of the discriminatory conduct; its severity; whether it is physically

- 16 -

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hostetler v. Quality Dining, Inc.* 218 F.3d 798 (7th Cir. 2000)(citations omitted). The impact of the harassment upon the plaintiff's work environment is assessed both objectively and subjectively. *Id.* The work environment cannot be described as "hostile" for purposes of Title VII unless a reasonable person would find it offensive and the plaintiff actually perceived it as such. *Id.,* (citation omitted).

## 1. Catherine Copello

Defendants argue that Copello's allegations consist of falsehoods and exaggerations. They argue that while she complains about the presence of strippers at various Custom events, she admits that no one actually took their clothes off. Similarly, although she complains about the presence of pornography at a seminar, she never actually saw the pornography. Additionally, Defendants argue that many of Copello's complaints are time barred because the conduct occurred more than 300 days prior to the filing of her EEOC charge and constituted discrete acts, not part of a pattern of activity. *But see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)(holding that the entire time period of harassing conduct may be considered). Defendants also argue that many of her claims are not actionable because they were directed at her co-workers, not her personally. They allege that

what remains of her allegations are a series of isolated events involving inappropriate language that do not rise to the level of sexual harassment required by Title VII. Finally, Defendants argue that Copello cannot satisfy the subjective test for any harassment claim because, they claim, she did not complain about the behavior and willing participated in parts of it.

The Supreme Court has held that "the objective severity of the harassment should be judged from the perspective of a reasonable person in plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). On one side of the spectrum lies sexual assaults, other physical contact, uninvited sexual solicitation, intimidating words or acts, obscene language or gestures and pornographic pictures. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Hostetler*, 218 F.3d at 807. On the other side lies occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. *Id.* The conduct that Copello alleges should be viewed cumulatively and not a series of isolated incidents, including incidents occurring prior to the 300-day window. *See Hostelter*, 218 F.3d at 808 ("The continuing violations doctrine allows a court to consider as timely all discriminatory conduct relevant to a claim, so long as there is sufficient evidence of a 'pattern or policy of discrimination.'"); *see also Silverman v. Johnson*, NO. 01 C 359, 2004 WL 2044182, *12, fn.2.

The type of conduct Copello alleges lies on the actionable side of the line dividing abusive conduct from offensive behavior. First, Copello alleges unwanted physical contact, in part done by her supervisors, Fleming and Rhode. See Doe v. Oberweis Dairy, 456 F.3d 704 (7th Cir. 2006)("The sexual act need not be committed in the workplace, however, to have consequences there."). She also alleges numerous uninvited sexual solicitations directed at her personally. See Quantock v. Shared Marketing Servs., 312 F.3d 899, 904 (7th Cir. 2002)(reversing grant of summary judgment where plaintiff alleged outright sexual proposition by company president). Copello alleges the constant use of inappropriate language, discussion of sexual exploits, both in her presence and directed at her and pressure to attend company events where inappropriate conduct occurred. Taken as a whole, the alleged conduct is sufficient to permit a reasonable jury to find that allegations altered Copello's conditions of employment and constituted sexual harassment. Further, when viewed in Copello's favor, the record supports the inference that she viewed her work environment as hostile as a result of the harassment. Before her written complaints, she complained orally on several occasions to her supervisor that the conduct was offensive and that she was not being treated equally. Those actions demonstrate concern over the conduct and an unwillingness to tolerate further harassment.

## 2. **Allison Kennedy**

Defendants argue that the lack of detail regarding inappropriate comments made by her co-workers show that Kennedy lacks competent evidence to support her charge of sexual harassment. They also argue that the touching by Maher does not rise to the level of sexual harassment required by law.

The conduct that Kennedy was subjected to constituted sexual harassment. Her direct supervisor inappropriately touched her, questioned her about her personal sexual experiences and suggested that she use sex to generate business. Perhaps most severe, Maher reached under Kennedy's skirt to grab her butt. *Hostetler*, 218 F.3d at 808 ("forcible physical contact of a rather intimate nature" falls on actionable side of line). She was also subject to inappropriate comments by co-workers. Kennedy specifically alleges that Wiszowaty made sexual comments in front of her including "slamming women in the butt" or grabbing their "boobs." *Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999)("Although they may be less important in defining her work environment . . . , incidents 'directed at others and not the plaintiffs . . . do have some relevance in demonstrating the existence of a hostile work environment.'")(citation omitted). A reasonable jury could conclude that the conduct Kennedy suffered was severe enough to alter the terms of her employment. Further, Kennedy's repeated

requests to Maher to stop the behavior show that she deemed the conduct to be harassment.

### a. Mitigation of Damages

Custom argues that Kennedy's damages should be limited because she failed to mitigate her damages. In order to show that Kennedy did not mitigate her damages, Defendants must prove that (1) she failed to exercise reasonable diligence to mitigate and (2) there is a reasonable likelihood that she might have found comparable work by exercising reasonable diligence. *Meyer v. United Airlines*, 950 F. Supp. 874, 876 (N.D. Ill. 1997). Contrary to Defendants' assertions, Kennedy testified that she took steps to find a comparable job including reviewing the classified ads, looking on-line for a position and going on interviews. Thus, an issue of fact exists with respect to Kennedy's mitigation of damages.

### 3. *Kimberly Fritkin*

### a. Independent Contractor

Defendants allege that Fritkin was an independent contractor and thus, not protected under Title VII. Courts analyze five factors to determine independent contractor status: (1) an employer's control and supervision of a worker; (2) the kind of occupation and nature of skill, including if skills are obtained in workplaces; (3) the responsibility for cost of operation; (4) the method and form of payment and benefits; and (5) the length of employment and/or expectations. *Knight v. United Farm Bureau Mut.*

*Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991). Of the factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor. *Id.*

Defendants allege that Custom had no control over Fritkin because she did not have to "punch in," had no set hours, worked out of her home and did not complete expense reports. In addition, Defendants argue that she did not have office keys or attend weekly sales meetings. Finally, Defendants argue that the form of payment evidence Fritkin was an independent contractor. She received a Form 1099 rather than a Form W-2, paid her own taxes, and did not receive vacation or sick days.

Plaintiffs argue that Fritkin was an employee of Custom because she had to regularly report to Heinz and was under his supervision. Custom limited the companies Fritkin could see and she was trained on the job. Further, her phone and other bills were paid for and her driving expense was factored into her salary. She was provided with tickets for entertaining and paid lunches for clients. She was also provided with Custom business cards to distribute. Her commitment to Custom was also open-ended.

Fritkin came to Custom with sales experience in the transportation industry. "An individual's unique work skills may indicate independent contractor status. (Citation omitted). However, if the individual requires substantial training and

supervision, an employee/employer status is more likely." *Worth v. Tyler*, 276 F.3d 249, 263 (7th Cir. 2001)(citing *Knight*, 950 F.2d at 380). The fact that Fritkin received a Form 1099 and not a Form W-2 also supports a finding that Fritkin was an independent contractor. These factors alone, however, do not end the inquiry. *See Worth*, 276 F.3d at 264.

The remaining factors support that Fritkin was an employee. Although Defendants argue that Fritkin did not receive benefits, she was offered health insurance but declined coverage because she received insurance through her husband. Her employment was not for a set amount of time but was open-ended. This also indicates an employer/employee relationship. Although Fritkin was responsible for paying her own taxes and was issued a Form 1099, the available evidence supports that Fritkin regarding her weekly pay as a salary. She requested to be responsible for her own taxes because at the time she became employed at Custom, she was a single mother of two children and was desperate for cash. Thus, she explained to Custom that she needed to earn a take home salary of $1,000. Despite the contract language, Fritkin did not know what a "draw" was and understood that she was earning a salary.

For a portion of her employment with Custom, Fritkin had her own desk at Custom. She attended training and was required to fill out call reports for her supervisor detailing what she did each week. Heinz, her initial interviewer and direct supervisor,

contacted her regularly to discuss her contacts. Although she did not attend weekly sales meetings due to her children's schedule, she went to the office at alternative times so that Heinz could review the content of such meetings. He frequently accompanied her on sales calls and outings with clients. Although Fritkin did not prepare expense reports, she testified that such reports were unnecessary because any entertainment, such as tickets for her clients, were provided by Custom. Additional entertainment, such as meals with clients, were paid for by Heinz because he accompanied her on those outings. Although Custom argues that Fritkin did not sign a non-compete agreement and was free to work for its competitors, the only time Fritkin was interested in engaging in other business, she was discouraged from doing so and told by Heinz to stay with Custom. Finally, there were restrictions on where Fritkin could attempt to sell, she had to obtain Heinz's approval before entering different areas. A review of the relevant factors demonstrates that there is sufficient evidence to support a finding that Fritkin was an employee. *Knight v. United Farm Bureau Mutual Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991)

### b. Hostile Work Environment

Defendants argue that because Fritkin did not complain, she fails to satisfy the subjective element for an individual harassment claim. Additionally, they argue that the complained of

actions did not alter her work environment. Contrary to Defendants' assertions, the alleged conduct is sufficient to constitute sexual harassment. Fritkin was subject to constant harassment by her direct supervisor, who was the Vice-President of Sales. He explicitly propositioned her for sex, including telling her he wanted to "fuck" her. He physically touched her, including on her butt and attempted to put his foot up her skirt. His told her that "[i]f you fuck with one person, you're just going to fuck yourself." A reasonable jury could conclude that the frequency and severity of these actions unreasonably interfered with Fritkin's work environment. Although Fritkin did not complain to human resources, she was not aware of the complaint procedure and was in fear of losing her job. Also, she did not receive the employee handbook. Further, there is an issue of fact with regard to whether Fritkin attempted to complain to Mandera. Thus, there is sufficient evidence to support a finding that Fritkin perceived her work environment as hostile.

## 4. Linda Dyson

Defendants argue that none of the comments Dyson alleges were directed at her. While Defendants admit Marcelino may have used foul language and touched her, Defendants argue this conduct does not support a sexual harassment claim. Although Dyson claims to have complained, she cannot recall the names of the individuals to whom she complained.

The line between an unpleasant working environment consisting of vulgar and offensive conduct and a sexually harassing environment consisting of conduct that is deeply offensive is not a bright one. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995). Certainly, Marcelino's conduct was vulgar and offensive. His constant use of profanity, however, does not give rise to a sexual harassment claim. The "rubbing" against Dyson when he walked by her does not constitute the type of forcible physical contact of an intimate nature that has been found sufficient to satisfy sexual harassment standards. His most offensive action, the proposition that he wanted to "fuck" her was indeed offensive but was an isolated incident. *See Whittaker*, 424 F.3d at 645-46 (holding that vulgar, coarse and boorish behavior spread over several months does not amount to actionable sexual harassment), citing *Bakersville*, 50 F.3d at 430. Thus, Defendants' Motion for Summary Judgment with regard to Dyson's sexual harassment claim is granted.

### 5. *Janene Sudis*

Sudis' allegations center around her going to the Crazy Horse strip club and receiving a lap dance. Sudis admits that it "was not dictated" that she go and that one of the women who had gone to the basketball game went home instead of going to the strip club. She went because she thought management would have looked differently at her if she had not attended. However, Sudis

admitted that she did not believe the woman who chose not to go to the Crazy Horse suffered any adverse consequences. Further, Sudis did not stop the lap dance and never complained about it, despite knowing the proper procedure and having complained about other matters.

Sudis' other allegations do not involve any direct sexual propositions or sexually explicit language directed toward her. Further, these events took place over the seven years that Sudis worked at Custom. The conduct Sudis alleges is more consistent with isolated events than a continuing practice and did not rise to the level of a sexual harassment claim. Summary judgment is granted with respect to Sudis' sexual harassment claim.

## D. **Ellerth Defense**

In *Ellerth* and *Faragher,* the Supreme Court established the standards that govern an employer's liability for sexually harassing behavior of a supervisor toward a subordinate employee. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Molnar v. Booth,* 229 F.3d 593, 599 (7th Cir. 2000). The Court created a distinction between "cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not." *Id.* at 600. The Court explained that an employer was vicariously liable "to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or

$- 27 -$

successively higher) authority over the employee" where "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher,* 524 U.S. at 807-08; *Ellerth,* 524 U.S. at 765. In cases where the supervisor took no tangible employment action, however, the Supreme Court permitted the defending employer to raise an affirmative defense to liability or damages. *Faragher,* 524 U.S. at 807; *Ellerth,* 524 U.S. at 765. In order to assert the affirmative defense Defendants must prove two elements: they exercised reasonable care to prevent and correct promptly any harassing behavior, *and* the victimized employee failed to take advantage of preventive or corrective opportunities provided by the employer. *Id.*

If the harassment was not done by a supervisor, Custom is only liable for an employee's conduct if it was negligent either in discovering or remedying the harassment. *Hall v. Bodine Electric Co.,* 276 F.3d 345, 356 (7th Cir. 2002)(citations omitted); *Cerros v. Steele Technologies, Inc.,* 398 F.3d 944, 952 (7th Cir. 2005). An employer satisfies its legal duty in coworker harassment cases "if it takes reasonable steps to discover and rectify acts . . . of harassment of its employees." *Id.,* citing *Parkins v. Civil Constructors of Ill. Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998).

Defendants argue that all Plaintiffs' claims are barred under *Ellerth.* Defendants argue that no plaintiff can prove any tangible

action was taken against her by a harassing supervisor. *See Hall v. Bodine Electric Co.*, 276 F.3d 345, 355 (7th Cir 2002)("An individual is not a supervisor unless he possesses the authority to *directly* affect the terms and conditions of victim's employment.")(citation omitted). They allege that any supervisor alleged to have engaged in harassment was not involved in the decision to terminate the individual. Further, Defendants argue that the first prong of *Ellerth* is satisfied because they took reasonable and preventive and corrective measures. They claim to satisfy the second prong of the affirmative defense because Plaintiffs failed to utilize the corrective opportunities available to them.

### 1. Catherine Copello

First, Defendants argue that Copello cannot prove any tangible action was taken against her by a harassing supervisor. They allege that any supervisor alleged to have engaged in harassment was not involved in the decision to lower her salary or offer her lessor perks than her male colleagues. Contrary to Defendants' assertions, Copello suffered a tangible action when her salary was lowered and again when she was terminated. Copello alleges harassment by a number of her supervisors, including Mike Fleming. She also alleges inappropriate comments and conduct by Mandera that contributed to the alleged hostile environment. It is not clear from the record who had input into the decision to lower

Copello's salary. Thus, there is an issue of fact as to whether a harassing supervisor was involved in the decision to lower Copello's salary.

Defendants also argue that the decision to terminate Copello was separate and apart from the alleged harassment. Defendants claim that Copello was terminated because she was one of the three lowest performers who were fired when Custom took on a competitor's business. By contrast, Copello argues that her accounts were not properly credited it to her, that she was assigned the lowest earning territory, Elgin, and she was informed that no one had ever been able to make Elgin profitable. Further, Copello submits revenue numbers showing that she was improving and that she was not one of the three lowest individuals. There is a genuine issue of material fact as to whether Copello was terminated for her performance or due to her complaints regarding sexual harassment. Thus, summary judgment is denied on the *Ellerth* defense with regard to Copello.

### 2. **Allison Kennedy**

Kennedy had only been employed for seven weeks when she was terminated. During those seven weeks, Maher was her single and direct supervisor and undoubtedly had input into the decision to terminate her. Maher trained her and accompanied her on sales calls. For her entire tenure at Custom, Kennedy alleges that Maher constantly harassed her. Before she was fired, she was told that

she was doing a good job. After she refused Maher's advances, she was terminated. When she attempted to contact Mandera to discuss her termination, she was told that Maher could run his department as he saw fit. A jury could infer that the decision to terminate Kennedy was motivated by her refusal to engage in relations with Maher and that Maher made the decision to terminate her. Thus, summary judgment is denied on this issue.

### 3. Kimberly Fritkin

Fritkin's pay was decreased by 25% prior to her resignation. Fritkin only had contact with Heinz, her alleged harasser. He interviewed her, participated in the decision to hire her, oversaw her weekly activities, and accompanied on her on sales calls. Fritkin alleges that her pay was decreased only after she told her alleged harasser "to fuck off" and refused to give in to his advances. Based on the record, Heinz would have participated in the decision to decrease her pay. Again, there is an issue of fact with regard to whether Heinz was involved in the decision to lower Fritkin's pay and whether her pay was lowered for reasons unrelated to the alleged harassment. For these reasons, summary judgment is denied on the *Ellerth* Defense with regard to Fritkin.

### 4. Custom Undertook Reasonable and Corrective Measures

Defendants also argue that they took reasonable and corrective measures by including a sexual harassment policy in its employee handbook. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806 (7th Cir. 1999)

- 31 -

(Defendant exercised reasonable care by including a detailed policy prohibiting sexual harassment in its employee handbook.). Fritkin, however, never received the employee handbook. Thus, Defendants fail to satisfy the first prong of the *Ellerth* defense with regard to Fritkin.

Although implementation of a sexual harassment policy may be sufficient to prevent sexual harassment that does not establish that Custom acted reasonably in remedying the harassment after it occurred or in preventing future misconduct. *Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 952(7th Cir. 2005). Before taking her complaints to the human resources department, Copello alleges that she complained several times to a Vice-President, John Murphy. As the Seventh Circuit held in *Cerros*, the employer's knowledge of the misconduct is what is critical, not how the employer came to that knowledge. Custom conducted an investigation into Copello's complaint only after she brought them in writing to the human resources manager. The investigation ended in written warnings and one disciplinary warning, given for an employee exposing his penis in front of his co-workers. Given the severity and extent of Copello's complaints, a reasonable jury could conclude that Custom did not act reasonably in remedying the harassment.

With regard to Kennedy, Copello complained to Klonowski about the Maher's alleged harassment of Kennedy. Kennedy was terminated

the next day and Klonowski failed to investigate any of the claims. Failing to investigate allegations of harassment does not constitute reasonable action in remedying the harassment after it occurred or in preventing future misconduct. *Cerros*, 398 F.3d at 952. Thus, Custom failed to satisfy the first prong of the *Ellerth* defense with regard to Kennedy as well.

### 5. Plaintiffs did not Fail to Utilize Corrective Opportunities

Copello followed Custom's sexual harassment policy by complaining first to a Vice-President and later to human resources. Kennedy complained to a manager. Fritkin was not aware of Custom's policy because she never received the employee handbook. As such, Custom fails to establish there is no issue of fact as to the second prong of the *Ellerth* defense.

### 6. Custom was not Negligent with Respect to Co-Worker Harassment

Even if no tangible action had been taken by a harassing supervisor, Custom also fails to establish that it was not negligent as to any co-worker harassment with regard to Copello. According to Copello's allegations, she repeatedly complained to John Murphy regarding the inappropriate language and touching and the sexual propositions. Before Copello went to human resources, these complaints were never addressed.

## E. Retaliation

42 U.S.C. § 2000 prevents an employer or labor organization from discriminating against someone because "he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e).

To overcome Defendants' summary judgment motion in their Title VII retaliation claims, Plaintiffs must show either direct evidence of retaliation or indirect evidence of the employer's retaliatory intent using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003). Under the direct method, Plaintiffs must show (1) protected activity, (2) adverse action and (3) a casual connection between the two. The adverse action requires plaintiff to show that "a reasonable employee would have found the challenged action materially adverse, which [] means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006).

Under *McDonnell*, Plaintiffs must first establish a prima facie case of discrimination by showing that she (1) engaged in a protected activity under Title VII; (2) she met the employer's

legitimate expectations; (3) she suffered an adverse employment action; (4) a causal connection exists between the adverse action and the protected activity and (5) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Williams v. Ill. Dept. Of* Corrections, No. 05 C 2151, 2006 WL 2495020, at *6 (N.D. Ill. Aug. 25, 2006); *Hill v. Am. Gen. Ben. Fin.,* 218 F.3d 639, 645 (7th Cir.2000). The burden then shifts to the employer to articulate a non-discriminatory reason for its actions. If the employer succeeds, the plaintiff may still prevail by demonstrating that the employer's stated reasons for the challenged action are merely pretextual and the employer's actual reason was discriminatory. *Rennie v. Dalton,* 3 F.3d 1100, 1108-09 (7th Cir.1993).

### 1. *Catherine Copello*

Copello attempts to prove the retaliatory causation through the direct method, using direct and circumstantial evidence to show she engaged in protected activity and suffered resulting adverse employment action. *See Sylvester v. SOS Children's Villages Illinois, Inc.,* 453 F.3d 900, 902 (7th Cir. 2006)("if [the plaintiff] can prove by means of circumstantial evidence that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains, that is fine" under the direct method.).

Copello argues that she engaged in protected context when she made internal complaints about the harassment. She lists several adverse actions that occurred as a result of her complaints including her decrease in salary, which she argues was not voluntary, her difficulty obtaining service for her clients through Kolzow after she complained about him, and Mandera's repeated comments that lives would be ruined if she proceeded with the EEOC charge, things would get ugly and she would not be able to work in the industry. The alleged threats by the company's president are direct evidence of a retaliatory motive.

Custom argues that Copello did not engage in protected contacts because many of her complaints were not through the formal complaint process. See Durkin v. City of Chicago, 241 F.3d 606 (7th Cir. 2003). Although the Seventh Circuit held in Durkin that an employee's informal complaints were not sufficient to constitute protected activity, it focused on the fact that the complaints were "vague and concerned subjects other than harassment" and thus were insufficient to notify her employer of a Title VII violation. See Jones-Walsh v. Town of Cicero, No. 04 C 6029, 2005 WL 2293671 (N.D. Ill. Sept. 14, 2005) ("a jury reasonably could find that [informal] complaints constitute protected activity."). Unlike the complaints in Durkin, Copello's complaints were specific and related to sexual harassment.

Custom also argues that Copello was a low performer and that was the reason for her decrease in pay and subsequent termination. Thus, there was no adverse action related to any protected activity. However, there are disputed facts regarding the level of Copello's sales and whether sales were properly credited to her. Copello was also told that her territory was a difficult one and that no one had been able to make it adequately productive. Further, Copello alleges that after she complained, she was subject to increased criticism and threats by Mandera if she did not drop the suit. *Collins v. Village of Woodbridge*, 96 F. Supp. 2d. 744 (N.D. Ill. 2000) ("a pattern of criticism by supervisors following the making of complaint can establish the existence of causal link.").

Based on a number of disputed facts, Copello's subsequent decrease in pay and the alleged conduct by Kolzow and Mandera, there is sufficient evidence to create a question of fact for the jury. As such, summary judgment is denied as to Copello's retaliation claim.

## 2. *Allison Kennedy*

Kennedy argues that she engaged in protected activity when she complained to Maher, Fisher and Copello (and in turn to Klonowski) about Maher's inappropriate behavior and complained to Mandera about Murphy's refusal to train her. Shortly following Kennedy's rejection of her direct supervisor, who was also the Vice-President

of Sales, and one day following report of such conduct to the human resources manager, Kennedy was terminated. *See Dey v. Colt Const. & Development Co.*, 28 F.3d 1446 at 1457.

Defendants argue that Kennedy's complaints did not constitute protected activity. Kennedy, however, did complain through the formal channels established by Custom by complaining to Maher, a Vice-President, and asking him to stop his inappropriate behavior. She also followed the formal channels when she informed Mandera that Murphy had refused to train her. Finally, she informed Mike Fisher, a manager. *See Jones-Walsh v. Town of Cicero*, 2005 WL 2293671, at *5 ("a jury reasonably could find that [informal] complaints constitute protected activity."). Defendants also claim that Kennedy failed to generate revenue during her seven-week tenure at Custom and that justified her termination. However, Maher's comment that Kennedy was doing a good job one week prior to her termination raises an issue of fact. Kennedy was fired almost immediately after rejecting Maher's advances. The suspicious timing of these events supports Kennedy's claim for retaliation. *Dey*, 28 F.3d at 1458 ("plaintiff may establish a link through evidence that the discharge took place on the heels of protected activity.") (citations omitted). Additionally, Kennedy attempted to discuss her termination with Mandera, who informed Kennedy that it was Maher's department and he could run it the way he wanted. Maher participated in the decision to terminate Kennedy, whether he

acted in retaliation in response to her complaints and refusal to engage in certain conduct with him is a question for the jury. *Dey,* 28 F.3d at 1459 ("Summary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.") (citation omitted). Summary judgment is denied as to Kennedy's retaliation claim.

### 3. *Kimberly Fritkin*

Plaintiffs allege that Defendants filed a lawsuit against Fritkin in retaliation for her cooperation and participation in this lawsuit. Defendants argue that Fritkin's participation in the lawsuit does not constitute protected activity because she did not file a charge with the EEOC. Defendants also argue that a meritorious lawsuit cannot form the basis for a retaliation claim.

Fritkin's participation in the lawsuit against Custom is protected activity under Title VII. *See Burlington Northern & Santa Fe Railway Co.,* 126 S.Ct. at 2414 ("Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints *and act as witnesses.*") (emphasis added). Under the Supreme Court's recent decision in *Burlington Northern,* Defendants distinction that she did not file an EEOC charge but is participating in the lawsuit is arbitrary and unpersuasive.

Fritkin also meets the second requirement of the McDonnell Douglas test because she has suffered an adverse action by being

- 39 -

sued and being forced to incur the expenses of hiring attorneys. Finally, whether Defendants' lawsuit was motivated by retaliation is a question of fact for the jury. The EEOC notes that Custom ignored Fritkin's purported debt until after the EEOC filed suit. Custom only filed the lawsuit after it failed to have Fritkin removed from the class. In addition, Custom has never filed a similar suit against any of its previous sales representatives. See Ajayi v. Aramark Business Serv. No. 00 C 4403, 2004 WL 763840, at *4 (N.D. Ill. March 3, 2004).

According to Fritkin, she understood her $1,000 weekly pay to be a salary and not a draw on commission. In fact, Fritkin did not understand what constituted a draw on commission. When she resigned from Custom, she attempted to meet with Mandera but was left waiting for an hour and half only to be told that he did not have time to meet with her. Following her resignation, Fritkin returned her Custom provided cell phone. As noted above, she did not receive any notification of that she owed Custom money until after she joined this lawsuit and Custom attempted to have her withdrawn from the case. The fact that Custom never notified Fritkin that she owed any money until after she joined an employment discrimination lawsuit is sufficient to allow a reasonable jury to conclude that the true motivation for Custom's suit was retaliation.

#### 4. *Corinne Miller*

Plaintiffs argue that Defendants unlawfully retaliated against Corinne Miller because she participated in the EEOC investigation surrounding Copello's complaint and told Mandera she did not want to monitor Copello. Plaintiffs argue that Miller meets the standards for unlawful retaliation under the direct method of proof because she was terminated some time after she informed Mandera she did not want to monitor Copello.

Defendants argue that Miller never complained about harassment, and any complaint was informal. They further argue that Miller had signed a five-year contract, the contract was complete, Miller's performance was unsatisfactory, and Custom reorganized in a way that eliminated her position.

Miller fails to present sufficient proof to survive summary judgment. In order to prove retaliation under the direct method, Miller must present "a convincing mosaic of circumstantial evidence." *Sylvester*, 453 F.3d at 903. The case can be made by assembling a number of pieces of evidence that, taken on a whole, provide strong support that all point in the same direction. *Id.* Miller alleges she made an informal complaint about sexual harassment but cannot remember the specifics. A vague complaint is not sufficient to satisfy this standard. *See Durkin*, 341 F.3d at 615 (holding that vague complaints concerning subject matters other than harassment did not suffice to meet retaliation standard). She

does not remember any specifics and in fact testified that on numerous occasions, she told human resources that she did not witness any sexual harassment. She testified that she felt she lost her job for three independent reasons: (1) she told Custom she was planning on retiring within a year; (2) her insurance costs were high and (3) she told Mandera she did not want to monitor Copello. Although she told Mandera that she did want to be a tattletale on Copello, she cannot remember the specifics of the conversation and believed she mentioned her dislike of the monitoring on one occasion. One such incident does not constitute "a convincing mosaic of circumstantial evidence." In addition, Custom submits evidence that it did not replace Miller because it reorganized its department. As such, summary judgment is granted with regard to Miller's retaliation claim.

## F. Sexual Discrimination Claims

Title VII prohibits employers from treating employees differently on the basis of their sex. 42 U.S.C. § 2000e-2(a)(1). To establish a claim of sex discrimination, or disparate treatment, a plaintiff can proceed either directly, by presenting direct and/or circumstantial evidence of the employer's discriminatory intent, or indirectly through the burden shifting method set for in *McDonnell Douglas Corp.*, 411 U.S. 792. Plaintiff-Interveners Copello and Kennedy elect to proceed under the direct method. The court must consider whether the purported difference in treatment

was due to the Plaintiffs' sex, and whether the different treatment affected Plaintiffs' compensation, terms, conditions, or privileges of employment. *Haugerud v. Amery School District*, 259 F.3d 678, 692 (7th Cir. 2001)(citation omitted). Plaintiffs must prove that they suffered a materially adverse employment decision. In assessing this, the court may consider the quantitative and qualitative changes in the plaintiffs' employment.

### 1. Catherine Copello

Copello alleges that she was discriminated against with regard to her pay, training and access to job benefits. She argues that she was treated differently based on her sex when she attended the Custom golf outing, was requested to entertain at the Crazy Horse, assigned her territory, and assigned quotes. She alleges that her car allowance was less than her male co-workers. As evidence of discriminatory intent, Copello alleges Mandera's comment once she was married that she would not be able to do her job because she would be "flat on her back." She also alleges it was sex discrimination because Mandera wanted to meet with both her and her husband to discuss her compensation.

Defendants argue that Copello cannot show any change in Copello's employment status which resulted from discriminatory intent. Contrary to Copello's assertion that she was given less of a car allowance because she was a woman, Defendants submit evidence that several men had lesser car allowances than Copello. Copello

- 43 -

also failed to submit evidence showing that her salary and commission were lower than her male counterparts. Similarly, although Copello was not given a territory close to her home, only one sales representative resided in his territory. Copello points to one account that she believed was taken from her on the basis of her sex. Defendants, however, submitted unrefuted documentary evidence that the client requested Mandera.

In response to Copello's allegations that she was discriminated against because of the presence of strippers at the golf event, Defendants point out that Copello was invited to attend the outing (as were her male co-workers) but Mandera explicitly told that her attendance was not required. Further, she had the same access to the Crazy Horse as her male co-workers for client entertainment purposes. Importantly, Copello also had the option to entertain clients at the other venues, such as sporting events, theaters, and restaurants. In fact, such entertainment was encouraged. While some of Defendants' comments may have been harassing and offensive, Copello fails to submit the requisite amount evidence that Custom discriminated against her in pay and job benefits in order to avoid summary judgment.

## 2. *Allison Kennedy*

Kennedy alleges that she was discriminated on the basis of her sex because John Murphy refused to train her. When Murphy refused to train her, Kennedy informed Mandera and was told she would be

trained without Murphy's involvement. Kennedy had experience in sales when she was hired at Custom and received training from individuals other than Murphy. Kennedy does not allege sufficient evidence that her conditions of employment were materially adversely affected by Murphy's refusal to train her. Defendants' summary judgment motion is granted with respect to Kennedy's sex discrimination claim.

## III. CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment **is granted in part and denied in part**.

Defendants' Motion for Summary Judgment is granted with respect to:

1. The sexual harassment claims of Linda Dyson and Janene Sudis;

2. The retaliation claim of Corinne Miller; and

3. The sex discrimination claims of Allison Kennedy and Catherine Copello.

The remainder of the Motion for Summary Judgment is denied. **IT IS SO ORDERED**.

Harry D. Leinenweber, Judge
United States District Court

Dated: _October 23, 2006_